## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RONALD P.,**[1] | ) | |
| | ) | **No. 20 CV 339** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | **March 21, 2022** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Ronald P. brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and social security income. Before the court are the parties' cross motions for summary judgment. For the following reasons, Ronald's motion is granted, the government's is denied, and the matter is remanded:

### Procedural History

Ronald filed his benefit applications in November and December 2015, alleging disability beginning on April 1, 2013, because of problems with his hand/wrist, back, and hip, headaches, anxiety, ADHD, and Raynaud's syndrome. (Administrative Record ("A.R.") 260, 275, 280-81.) After his applications were denied, (id. at 79, 80, 111, 112), Ronald sought and received a hearing before an

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

administrative law judge ("ALJ"), (id. at 158-59, 171, 210). Ronald and a vocational expert ("VE") testified at his July 2018 hearing, (id. at 24-54), and the ALJ ruled in December 2018 that Ronald was not disabled, (id. at 116-29). The Appeals Council denied Ronald's request for review, (id. at 1), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Ronald then filed this action seeking judicial review of the decision, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 6).

**Facts**

### A. Medical Evidence

Ronald saw Dr. Edwin Miller, an internist, about once a month from spring 2013 through spring 2016, and then he received continuing care from Dr. Abigail Struck-Marcell, a family physician, about every two or three weeks beginning in 2017. Both providers followed Ronald's back, hip, and extremity issues, headaches, and mental health conditions, referred him to specialists, and treated him with a variety of medications, including prescriptions to combat ADHD, anxiety, and depression, and high doses of opioid narcotics. He has been taking opioids since a 2012 car accident.

In the fall of 2013, increasing complaints of back and hip pain led to Ronald's first round of MRIs. A November 2013 MRI of Ronald's lumbar spine revealed lumbar spondylosis, a posterior annular tear at L5-S1, minimal compression of the transiting S1 nerve roots and mild bilateral foraminal stenosis caused by mild disc bulge with endplate spurring and facet joint hypertrophy, and L4-5 mild bilateral

2

foraminal stenosis.  (A.R. 494.)  That same month, a left hip MRI revealed a normal hip joint, but abnormal symmetrical bone marrow edema suggestive of sacroiliitis. (Id. at 495.)  An orthopedic surgeon concluded that Ronald's lumbar MRI showed "moderate to severe degeneration at L5-S1," and "mild degeneration at L4-5," as well as mild foraminal stenosis bilaterally, and recommended physical therapy and rehabilitation to wean off opioids.  (Id. at 742-43.)  But Ronald's pain and opioid use continued, and by spring 2015 he reported "whole-body pain," which worsened with walking and standing, and severe anxiety.  (Id. at 499, 558.)  Records note that Ronald had "a number of conservative treatments including physical therapy, and acupressure," his physical examinations were largely normal, and he was not considered a good candidate for surgery.  (Id. at 500.)

His providers then ordered updated MRIs.  A lumbar MRI in June 2015 showed "[v]ery mild degenerative changes . . . most pronounced at L5/S1 where there was a small central disc protrusion," but "no significant spinal canal or neural foraminal stenosis."  (Id. at 491.)  The result also indicates "[a]bnormal marrow signal involving sacrum and iliac bones," which required an MRI of his pelvic region.  (Id. at 492).  That MRI shows "moderate edema and enhancement within the . . . iliac and sacral aspects of bilateral sacroiliac joints, consistent with sacroiliitis," and indicates that in a patient "of [his] age, differential diagnosis include[s] . . . ankylosing spondylitis, or other inflammatory arthropathy."  (Id. at 489.)  Ronald's providers continued to recommend conservative care and that he stop using opioids.  (Id. at 502.)

3

In the meantime, Dr. Miller prepared physical and mental capacity assessments in December 2015 in connection with Ronald's disability applications. He opined that Ronald could: walk 15 feet without rest or significant pain; sit for one hour in an eight-hour workday; and stand or walk for less than one hour. (Id. at 527.) He also opined that Ronald must take half-hour breaks "often," and was limited to: grasping, turning, and twisting objects with either hand for 20% of a workday; engaging in fine manipulation for 25% of a workday; reaching with his arms for 15%; and never lifting or carrying any weight. He further opined that Ronald's symptoms were severe enough to constantly interfere with the concentration required to perform simple work-related tasks. (Id.)

With regard to mental limitations, Dr. Miller thought that Ronald was: extremely limited in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; moderately limited in his ability to understand and memorize, interact with the general public, ask simple questions, request assistance, accept instructions, and respond appropriately to criticism; slightly limited in his ability to adapt to changes, take appropriate precautions in the face of hazards, and set realistic goals or make plans independently of others; and had slight-moderate limitations in his ability to engage in sustained concentration and persist. (Id. at 529-31.) He predicted that Ronald would miss at least three to four workdays per month. (Id. at 528, 530.)

In January 2016 Ronald and his fiancé reported that Ronald suffered from "severe anxiety" and ADHD, had difficulty concentrating, and took longer than

usual to complete housework and self-care because of pain. (Id. at 362-68, 383-89.) Ronald also reported numbness in his hands and feet and difficulty standing or sitting for prolonged periods. (Id. at 362, 367.)

Dr. Dante Pimentel conducted a consultative medical evaluation ("CME") in March 2016. He concluded that Ronald could walk more than 50 feet unassisted and exhibited 5/5 strength in all extremities but acknowledged that his ability to perform work-related activities was impaired because of his back and hip pain. He noted Ronald having extreme difficulty squatting, rising and hopping on one leg, and moderate difficulty tandem walking, walking on toes and heels, and getting on and off the examination table, as well as erythema of the hands, sausage-appearing digits, and decreased sensation to light touch. (Id. at 544-45, 548.) He also opined that Ronald could not responsibly manage his funds. (Id. at 544-45.)

The following month, state agency consultants concluded at the initial determination level that Ronald could perform light work while avoiding concentrated exposure to extreme temperatures, vibrations, and hazards. (Id. at 60, 62-63, 65.) They also found he was only mildly restricted in daily living activities and suffered only mild difficulties in maintaining social functioning and concentration, persistence, or pace. (Id.) But Ronald and his fiancé reported that his pain worsened soon thereafter, that he needed to lie down for several hours each day to relieve his pain, and that it was taking longer than before to perform daily activities. (See, e.g., id. at 394, 397, 402-04, 407, 411, 413.) Ronald also reported joint stiffness and his hands "locking up." (Id. at 394.)

5

In June 2016 Dr. Miller opined in a mental disorder questionnaire that Ronald could care for himself and handle his financial affairs, but he required a cane and more frequent breaks to complete tasks and chores, and could not sit or stand for long periods, handle a full-time work schedule, or expect his condition to improve. (Id. at 572-76.) A few weeks later, Ronald went to an emergency room because of numbness in his ring and pinky fingers. (Id. at 1128.) He presented with grip strength of 4/5, "+numbness in distribution of ulnar nerve distal to level of the wrist," and walked with an abnormal gait and cane. He was directed to consult with his orthopedic surgeon as soon as possible. (Id. at 1130-31.)

A few months later, a state agency consultant concluded on reconsideration that Ronald could perform light work with frequent stooping and occasional climbing of ladders, ropes, or scaffolds, while avoiding concentrated exposure to extreme cold, vibrations, and hazards, and that he also was limited to frequently feeling bilaterally because of "decreased sensation to light touch." (Id. at 90-94.) The state agency psychological consultant pointed to an "unremarkable" formal mental status evaluation completed earlier that month to support the conclusion that Ronald suffers from only mild restriction of daily living activities and mild difficulties in maintaining social functioning and concentration, persistence, or pace, and that his ADHD and anxiety conditions were not severe. (Id. at 88-89, 590-91.) But Ronald thereafter reported that his physical condition had declined further, and his treatment notes indicate that his mental state also was declining. As such, Ronald's pain medication was increased, and he was referred to a

psychiatrist. (See id. at 425-26, 615, 1182.) There is no record indicating whether Ronald received any psychiatric treatment.

The following year, in August 2017, Ronald underwent an updated pelvic MRI, which shows "incomplete fractures" and "moderate adjacent edema, as well as moderate edema of the sacral ala." (Id. at 651.) He was referred to a rheumatologist, (id. at 634), and in November 2017, Dr. Anjali Gopal noted swelling in Ronald's hands and his right knee but normal gait and station, (id. at 1211-26). Dr. Gopal determined that Ronald likely suffers from ankylosing spondylitis ("AS"),[2] started him on prednisolone and later Enbrel, indicated that she hoped to reduce his use of opioids once his conditions improved, and ordered x-rays. (Id.) The resulting x-rays show "bilateral, symmetric sacroiliitis," reflecting "left femoral head/neck junction cam deformity" and "diffuse osteoporosis." (Id. at 1242-43.)

In December 2017 Dr. Struck-Marcell opined that Ronald: would need to recline or lie down during an eight-hour workday in excess of regular breaks; could sit for two hours and stand/walk for one; would need eight unscheduled 15-minute breaks; could lift and carry up to 10 pounds frequently and 20 pounds occasionally; could use his hands to grasp, turn, and twist objects and his arms to reach 50% of the time; and would miss more than four workdays per month. (Id. at 1250-51.) She also opined that Ronald's symptoms would constantly interfere with the

---

[2] AS is an inflammatory disease that can cause vertebrae to fuse over time, along with pain and stiffness in various parts of the body, including the joint between the spine and pelvis, the lower back, hips, and shoulder joints. *See* www.mayoclinic.org.

attention and concentration needed to perform simple work-related tasks. (Id. at 1250.)

Treatment records generated thereafter reflect Ronald's continued complaints of pain and joint stiffness, swelling in his lower limbs and extremities, and osteopenia. (Id. at 1268-69, 1275, 1373.) In spring 2018 Ronald reported 10/10 low back pain and difficulty walking. (Id. at 1306, 1373, 1380.) He also reported worsening anxiety and depression and increased pain with standing and walking. (Id. at 1276, 1373.) In addition, an EMG of Ronald's right wrist resulted in a carpal tunnel diagnosis and a sleep study showed he also suffers from severe obstructive sleep apnea. (Id. at 1349, 1351, 1385.) Dr. Struck-Marcell prescribed medication for Ronald's migraines, which had increased to two episodes a week, (id. at 1351), but counseled him again to reduce his opioid intake, (id. at 1349), and Dr. Gopal switched him from Enbrel to Humira for his AS because of side effects, (id. at 1380).

## B. Ronald's Hearing Testimony

Ronald was 34 years old and was living with his fiancé and their six-year-old son at the time of his hearing. (A.R. 28, 260.) He testified that his fiancé works full time and that he is the primary caregiver for their son. (Id. at 28, 49.) He also testified that he and his fiancé were expecting a daughter. (Id. at 28.)

Ronald said he completed automotive technology certification classes and worked until December 2015, when he quit his customer service position at an auto parts store because he was assigned duties exceeding the light-duty work prescribed by his physician. (Id. at 29, 37.) His work history includes other jobs that required

him to stand at least 50% of the time and lift as much as 100 pounds. (Id. at 30-32.) Ronald testified that he had applied for office work within a couple of months of the hearing but is not sure he could work full time if offered, citing a need to switch between sitting, standing, and lying down to relieve his pain. (Id. at 29-30.)

Ronald explained that his AS has been getting worse since 2016. (Id. at 32, 37.) He described having three or four "bad days" per week but said that his pain was constant, rating it at 8/10 without medication, and 5/10 with it on bad days. (Id. at 34-35, 38-39.) He testified that he switched from Enbrel to Humira because of side effects, and that while he also took opioids, the plan was to taper off slowly if Humira reduced his pain and swelling. (Id. at 33-34.) In addition to these medications, Ronald testified that he used an inversion table at home daily, and that he also had a prescription for medical marijuana. (Id. at 35, 47.) But Ronald does not use marijuana because he is unable to afford the prescription and, in any case, he could not drive if he used it as prescribed. (Id. at 35-36.)

Ronald testified that he also suffers from carpal tunnel in his right wrist, which causes his wrist to lock up and pop in and out of place when lifting or carrying things. (Id. at 29, 44.) He wears a wrist brace overnight, ices his wrist, and takes his medications for pain, which he described as 4/10. (Id. at 44-45.) Ronald reported that his right shoulder had also begun to pop in and out of place. (Id. at 45.) He also has been diagnosed with severe obstructive sleep apnea, ADHD, and anxiety. (Id. at 43-44, 48.) Regarding his abilities and daily activities, Ronald testified that he could: lift 20 pounds and sit for a half-hour to an hour with breaks

to stand up; make simple meals like macaroni and cheese and sandwiches; dress himself; grocery shop and clean and dust furniture; drive; and swim with his son. (Id. at 39, 41, 47-48.)

## C.    VE's Hearing Testimony

A VE testified at the hearing and described Ronald's past work as performed at the heavy level. (A.R. 50.) The ALJ then posed a series of hypotheticals to the VE describing someone of Ronald's age, education, and work history. The first hypothetical concerned an individual with a residual functional capacity ("RFC") for light work with the following limitations: occasional stooping, crouching, and ramp and stair climbing; no ladder, rope, or scaffold climbing; no kneeling or crawling; frequent fingering; occasional hazards and exposure to extreme cold and vibrations; simple, routine, repetitive tasks and simple work-related decisions; and occasional workplace changes. (Id. at 50.) According to the VE, such a person could perform the light exertional level jobs of order caller, office helper, and housekeeping cleaner. (Id. at 50-51.) The second hypothetical individual had the same limitations, except that he also needed to shift positions for a minute or two every half-hour while remaining on task, such that if he had been standing, he would sit, and vice versa. (Id. at 51.) The VE testified that the same jobs would exist in the same numbers. (Id.) The third hypothetical individual had the same limitations as the second, except that he also needed to sit for six hours per workday. (Id.) The VE concluded that the order caller, office helper, and housekeeping cleaner jobs would not be available, but that the sedentary, unskilled work of circuit board

assembler, addresser, and call-out operator would be. (Id. at 51-52.) The VE added that the same jobs would exist if the individual used a cane to walk, but no work would exist if he could only sit for two hours and stand for one. (Id. at 52.)

**D.    The ALJ's Decision**

The ALJ engaged in the standard five-step evaluation process, 20 C.F.R. § 404.1520(a),[3] and concluded at steps one and two that Ronald had not engaged in substantial gainful activity between his April 1, 2013 disability onset date and the date of the ALJ's decision, and that he suffers from the severe impairments of AS, peripheral neuropathy, carpal tunnel syndrome, obstructive sleep apnea, depression, anxiety, and opioid dependence. (A.R. 118.) The ALJ determined that Ronald also suffers from non-severe migraines, ADHD, and Raynaud's disease, and stated that the RFC accounted for any resulting limitations. (Id. at 119.)

At step three the ALJ concluded that Ronald's impairments were not of listings-level severity. With respect to his mental impairments, the ALJ found that Ronald was moderately limited in understanding, remembering, or applying information, concentrating, persisting, or maintaining pace, and adapting and managing himself, and mildly limited in interacting with others, and therefore that the "paragraph B" criteria were not satisfied. (Id. at 119-21.)

Before turning to step four, the ALJ determined that Ronald retained the RFC to perform sedentary work but was limited to: occasional stooping, crouching,

---

[3]    Amendments to the Social Security regulations regarding the evaluation of medical evidence were published on January 18, 2017. 92 FR 5844-84 (Jan. 18, 2017). But because these amendments apply only to claims filed on or after March 27, 2017, references to the regulations in this opinion refer to the prior version.

climbing stairs and ramps, and exposure to hazards, extreme cold, or vibrations; never kneeling or crawling or climbing ladders, ropes, or scaffolds; frequent fingering and feeling bilaterally; performing simple, routine, repetitive tasks; and engaging in simple work-related decision-making with occasional workplace changes. (Id. at 121.) The ALJ concluded that Ronald also needed to shift positions every half-hour for a minute or two while remaining on task and use a cane to walk. (Id.)

Regarding the opinion evidence, the ALJ gave "some" weight to the state agency medical consultants' opinions because more recent evidence reveals that Ronald is "more limited," "continue[d] to report having pain," "use[d] his cane as needed," "need[ed] to shift positions," and suffers from carpal tunnel syndrome. (Id. at 125.) The ALJ afforded only "little" weight to the state agency psychological consultants' opinions that Ronald's mental impairments were not severe, concluding they caused moderate limitations in his ability to perform work-related activities. (Id. at 127.) The ALJ also ascribed "some" weight to Dr. Pimentel's CME insofar as it shows Ronald is limited to sedentary work with the ability to shift positions, must walk with a cane, and has a reduced capacity for performing postural activities, being exposed to certain environmental factors, and performing fingering and feeling. (Id. at 125.)

The ALJ gave only "little" weight to Dr. Miller's December 2015 physical and mental assessments and "partial" weight to his June 2016 mental disorder questionnaire. (Id. at 125-26.) The ALJ pointed out that Ronald's physical

examinations reflect mostly normal findings and his imaging only mild findings. (Id. at 126.) The ALJ also noted that contrary to Dr. Miller's opinions, Ronald generally has a normal gait, kempt appearance, and normal behavior, and he drives, shops, is the primary caregiver for his son, and has recently applied for work. (Id.) And the ALJ emphasized that Ronald's own function report states that he could pay attention and follow instructions. (Id.) For largely the same reasons, the ALJ gave "little" weight to Dr. Struck-Marcell's December 2017 assessment.[4] (Id.) The ALJ concluded at step four that Ronald could not perform his past work but ultimately determined at step five that he was not disabled because jobs existed in significant numbers that he could perform, including circuit board assembler, addresser, and callout operator. (Id. at 1628-29.)

## Analysis

Ronald argues that the ALJ erred by: (1) incorrectly assessing his RFC; (2) improperly weighing his treating physicians' opinions; and (3) wrongly rejecting his subjective symptom allegations. (R. 20, Pl.'s Br.; R. 28, Pl.'s Reply.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

---

[4] The ALJ also considered Ronald's fiancé's third-party function reports and concluded they provided insight into the severity of Ronald's impairments but did not support further restriction in light of the objective evidence. (Id. at 127.)

(quotation and citations omitted). This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ, allowing reversal "only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). The court considers Ronald's arguments in turn.

## A.     RFC Assessment

When determining the RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). "[B]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

Ronald first complains that the ALJ failed to explain her conclusions that he could sit for six hours per workday, remain on-task while shifting positions between sitting and standing, and did not need to lie down. In response, the government contends that the ALJ appropriately relied on the "mostly normal" findings on examination—including normal gait, strength, and range of motion—and "mild imaging," and argues that Ronald is really asking the court to reweigh the evidence. (R. 25, Govt.'s Resp. at 13, 15.)

The government's response accurately describes the ALJ's analysis. However, the problem here is that it amounts to a mere summary and fails for lack of explanation. *See Elmalech v. Berryhill*, No. 17 CV 8606, 2018 WL 4616289, at

*10 (N.D. Ill. Sept. 26, 2018) ("[m]erely summarizing the record . . . is not in itself a substitute for an ALJ's duty to explain the basis of the RFC"); *Mark J. v. Saul*, No. 18 CV 8479, 2020 WL 374676, *5 (N.D. Ill. Jan. 23, 2020) (holding that while the ALJ "reviewed the medical evidence in some detail," he did not follow "SSR 96-8's directive to provide a narrative explanation of how he arrived at his conclusion and build a logical bridge between the record and the RFC"). To be sure, while the state agency consultants opined in 2016 that Ronald could sit for six hours in an eight-hour workday, the ALJ acknowledged that Ronald's condition had worsened since that time and discounted those opinions on that basis. (A.R. 121, 125.) Having noted the change, she failed to explain how she determined that Ronald's ability to sit had not also worsened. And that matters because even if there is "enough evidence . . . to support the ALJ's decision" in this regard, this court must "confine [its] review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *see also Norris v. Astrue*, 776 F. Supp. 2d 616, 638 (N.D. Ill. 2011) (remanding where it was "not clear what medical evidence the ALJ relied on to support her RFC findings because she did not articulate" it). Those reasons are lacking here. *See* SSR 96-8, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts."); *Williams v. Bowen*, 689 F. Supp. 825, 830 (N.D. Ill. 1988) (remanding for further clarification of inconsistencies in ALJ's decision).

15

Similar problems attach to the ALJ's conclusions that Ronald needs only two minutes to switch between sitting and standing and could remain on task while doing so. Nothing in the record seems to support these conclusions. And while the ALJ pointed to Ronald's hearing testimony that he could sit for a half-hour to an hour but sometimes stands, (A.R. 122), the same does not provide an obvious basis from which to draw these conclusions. To the contrary, taking just two minutes to switch positions while remaining on task seems impossible if one credits Ronald's testimony that he also needs to stretch and lie down periodically to reduce his pain—points the ALJ neglected to address when formulating the RFC. Nor did the ALJ elicit testimony from the VE on whether a hypothetical individual with those limitations could still work. Given the potential impact of these limitations if substantiated, she must grapple with them on remand. *See Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012) ("One does sedentary work sitting . . . not lying down.").

Moreover, the ALJ did not address evidence that seems to conflict with her conclusion. Specifically, the July 2015 pelvic MRI reflecting "moderate edema and enhancement within the . . . iliac and sacral aspects of bilateral sacroiliac joints, consistent with sacroiliitis," and the August 2017 pelvic MRI that also reflected "incomplete fractures," (A.R. 489, 651), appear to support a more restricted assessment, but the ALJ did not address these reports. In addition, like the 2017 MRI, "several hundred pages of [other] evidence" postdates the last state agency opinion. (R. 28, Pl.'s Reply at 9.) And it is unclear whether the ALJ analyzed the

newer evidence. For example, the ALJ based her overall physical RFC assessment in part on her understanding that Ronald "denied having any numbness or tingling" and that his physical examinations revealed "no swelling." (A.R. 122.) But that understanding is contradicted by more recent evidence not referenced in her ruling. (See, e.g., id. at 1213 (Dr. Gopal's November 2017 progress notes reflecting right knee pain and swelling), 1265 (Dr. Gopal's December 2017 progress notes indicating right foot numbness, swelling in his left ankle, and "similar" symptoms in his right knee), 1275 (Dr. Struck-Marcell's January 2018 progress notes indicating left leg numbness), 1303 (Dr. Gopal's April 2018 progress notes indicating "considerable swelling in both legs"), and 1376 (Dr. Gopal's May 2018 progress notes indicating "worsening edema" in lower extremities)). Nor did the ALJ address the irregularities in the November 2013 left hip MRI, emphasizing that it "revealed a normal left hip joint," but failing to mention that it also indicated "[a]bnormal symmetrical bone marrow edema within the ala of sacrum and iliac blades suggestive of sacroiliitis." (Id. at 122, 495.)

At bottom, "the Court cannot 'reweigh' evidence that was not weighed by the ALJ in the first instance." *Annette S. v. Saul*, No. 19 CV 6518, 2021 WL 1946342, at *14 (N.D. Ill. May 14, 2021). But because "the ALJ did not even mention the[se] objective findings . . . the [c]ourt cannot be confident that the ALJ considered them." *Id.* Nor can it be certain that this was harmless. It takes no great leap of logic to conclude that the ALJ's failure to discuss and properly represent this evidence calls into question her determinations that Ronald could sit for six hours and had

minimal position-shifting needs. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot . . . ignor[e] evidence that points to a disability finding."). And because the 2017 MRI and much of the other evidence not addressed post-dates the last state agency consultant's opinion, the ALJ should consider the significance of this evidence on remand and seek additional opinions on it if necessary. *See Kemplen v. Saul*, 844 Fed. Appx. 883, 888 (7th Cir. 2021) (an ALJ must "seek an additional medical opinion if there is potential decisive evidence that postdates the state agency consultant's opinion"); *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) (ALJs must "rely on expert opinions instead of determining the significance of particular medical findings themselves").

Ronald also complains that the ALJ concluded he was capable of "frequent" bilateral fingering, even though no physician opined on this functional limit and the ALJ failed to sufficiently explain it. In fact, no state agency consultant opined on any fingering limitation at all. And while the ALJ discounted Ronald's treating physicians' more restrictive assessments, she did so based on inconsistent findings. Indeed, the ALJ reasoned that Ronald was not diagnosed with carpal tunnel syndrome until May 2018 and that his diagnosis was only "mild" and limited to his right wrist. She concluded from this that there is no evidence to support manipulative limitations until that time. (A.R. 122, 126.) But the ALJ acknowledged elsewhere that Ronald experienced issues in *both* hands as early as March 2016, and that in addition to carpal tunnel syndrome Ronald also had

Raynaud's disease. (See id. at 119 (citing id. at 544-45, 549 (March 2016 CME reflecting "sausage-appearing" digits, decreased sensation to light touch, erythema in both hands, and Raynaud's), 1149 (July 2016 treatment records reflecting Raynaud's and numbness in left ring and pinky fingers and fingers that were warm to the touch), and 39-40 (Ronald's hearing testimony that his fingers swell up three days a week and his hands go numb and lose feeling)).) The record also reflects that Ronald experienced manipulative difficulties regularly during at least the almost two-year period leading up to his carpal tunnel diagnosis. (See id. at 1128-30, 1225, 1299, 1303, 1376-77 (medical notes from July 2016 through May 2018 reflecting hand numbness and swelling).)

While the ALJ concluded that Ronald's Raynaud's disease was not severe, (id. at 119), that finding does not absolve her from considering any associated limitations in assessing Ronald's RFC, or connecting the evidence to that assessment. Further, given that two of the jobs the ALJ concluded that Ronald could perform involve frequent fingering and the dearth of recent evidence regarding Ronald's functional capabilities, she may wish to consult with a medical expert when doing so. *See* "Touch-Up Screener, Printed Circuit Board Assembly," DOT Job No. 726.684-110, 1991 WL 679616, and "Addresser," DOT Job No. 209.587-010, 1991 WL 671797; *Kemplen*, 844 Fed. Appx. at 887, 888 (remanding where "[e]ven more than disregarding [certain] evidence, the ALJ did not identify a basis for why [the claimant] could tolerate 'frequent' handling" and emphasizing that ALJ "must seek an additional medical opinion if there is potential decisive evidence that

19

postdates the state agency consultant's opinion"); *Marianne T. v. Saul*, No. 19 CV 6171, 2021 WL 1088322, at *4 (N.D. Ill. March 22, 2021) (ALJ erred in failing to "refer to records regarding [claimant's] functional capabilities" and to "construct the requisite accurate and logical bridge from the evidence to the ALJ's 'middle ground' physical RFC").

Ronald also argues that the ALJ failed to account for the moderate limitations she ascribed in concentrating, persisting, or maintaining pace ("CPP"), and adapting or managing himself. (R. 20, Pl.'s Br. at 6.) Notably, no state agency consultant opined on either limitation. And while the ALJ specifically noted that Ronald's mental status examinations were mostly normal, he was "able to stay on task and concentrate" during his CME and indicated in his function report that he could pay attention and follow instructions, she apparently credited some or all of his hearing testimony to the contrary. (A.R. 120 (Ronald's hearing testimony that he has difficulty concentrating, needs things repeated, and his mind wanders).) Similarly, although the ALJ noted that Ronald was "cooperative" at his mental status examinations, with an "appropriate" mood and normal affect, speech, judgment, and insight, she concluded that Ronald was moderately limited in regulating emotions, controlling behavior, and maintaining his well-being in a work setting. (Id. at 120, 124.) Yet none of the specific limitations identified by the ALJ are included in either the hypotheticals posed to the VE or the RFC. The hypotheticals and RFC instead merely limit Ronald to simple, routine, repetitive tasks, and simple work-related decision-making. (Id. at 121.)

Generally, "a hypothetical posed to a VE must incorporate *all* of the claimant's limitations supported by the medical record—including moderate limitation in concentration, persistence, and pace." *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015). And a moderate CPP impairment usually is not captured by a limitation to simple, routine, or repetitive tasks. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("limiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace"); *Varga*, 794 F.3d at 814 ("[W]e have repeatedly rejected the notion that a hypothetical like the one here 'confining the claimant to simple, routine tasks . . .' adequately captures" CPP limitations.) (quoting *Yurt*, 758 at 858-59). This is because "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620; *see also* SSR 85-15, 1985 WL 56857 (1987) ("[T]he skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job."). As a result, an ALJ typically must include the claimant's specific CPP limitations in the hypotheticals posed to the VE, rather than alternative phrasing. *See O'Connor-Spinner*, 627 F.3d at 620 (stating that "the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical"). This is particularly true where, as here, "the ALJ poses a series of increasingly restrictive hypotheticals to the VE." *Id.*

But specific limitations are not required when the VE "independently reviewed the medical record or heard testimony directly addressing those [CPP] limitations," or "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (quoting *O'Connor-Spinner*, 627 F.3d at 619). Here, there is no indication that the VE independently reviewed Ronald's medical records, and the RFC does not necessarily account for the moderate CPP limitations the ALJ ascribed to him. *See Varga*, 794 F.3d at 814-15 (holding that "simple, routine, and repetitive tasks" and "simple work related decisions with few if any [workplace] changes" failed to account for moderate CPP difficulties that were "related to [claimant's] diagnosed anxiety and depression, as well as her physical problems and pain").

The government nevertheless argues that *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019), and *Burmester v. Berryhill*, 920 F.3d 507 (7th Cir. 2019), direct that the RFC here was sufficient. (R. 25, Govt.'s Resp. at 18.) But while the Seventh Circuit approved of similar mental RFC limitations in those cases, they are easily distinguishable from the facts of this case. First, the claimant in *Jozefyk* did not testify about concentration-related difficulties, and the ALJ found only a "mild mental functioning impairment" that did not surface unless the claimant was with others—a detail specifically accounted for in the RFC there and not present here. 923 F.3d at 495, 498 (reflecting a VE hypothetical and RFC limiting the claimant to "no more than occasional contact with supervisors and coworkers; no contact with

the public; and an assigned work area at least ten to fifteen feet away from coworkers"). And the court in *Burmester* noted that the ALJ gave great weight to a physician's opinion that the claimant in that case had the ability to "understand, remember and carry out simple instructions subject to physical limitations" and "should be able to withstand routine work stress and adapt to typical job site changes," and that "maintaining concentration and attention should be manageable." 920 F.3d at 511-12.

In contrast, the ALJ here rejected the state agency consultants' opinions that Ronald's mental impairments were not severe, and apparently agreed with Ronald and his physicians' reports concerning his concentration difficulties.[5] In this case, the ALJ failed to present Ronald's CPP limitations to the VE. As a result, the VE's "assessment of the jobs available to [Ronald] necessarily is called into doubt[.]" *Moreno*, 882 F.3d at 730; *see also Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("When the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments," the error "calls into doubt the VE's ensuing assessment of available jobs.").

Ronald's complaints about his limitations in adapting and managing himself also have merit. Neither the hypotheticals presented to the VE nor the RFC assessment specifically account for the limitations the ALJ ascribed to him in regulating emotions, controlling behavior, and maintaining his well-being in a work

---

[5] The government also cites *Dudley v. Berryhill*, but it is distinguishable because in that case the claimant's "greatest limitations" were determined to be "stress- and panic-related," whereas Ronald's limitations are broader. 773 Fed. Appx. 838, 842 (7th Cir. 2019).

setting. (A.R. 50-52, 120, 121.) The government responds that the RFC is sufficient "because it is easier for one to regulate his emotions at work if required to perform only simple, routine, repetitive tasks and to make only simple work-related decisions in a work setting that is relatively static." (R. 25, Govt.'s Resp. at 19.) Maybe so, but the ALJ did not express this reasoning and this court's review must necessarily be confined "to the reasons supplied by the ALJ."[6] *Steele*, 290 F.3d at 941. Having supplied no reasons, this too was error.[7]

## B.     Treating Physicians' Opinions

Ronald next contends that the ALJ improperly weighed the opinions of his treating physicians, giving "little" weight to Dr. Miller's December 2015 opinions and Dr. Struck-Marcell's December 2017 opinions, and "some" weight to Dr. Miller's June 2016 opinions. A treating source's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quotation and citation omitted). Nevertheless, an ALJ may give such an opinion less weight if she offers "good reasons," *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016), and the Seventh

---

[6]   The government also argues that Ronald "pointed to almost nothing more than his own bare statements" to support a need for greater restrictions. (R. 25, Govt.'s Resp. at 19.) But the ALJ concluded that Ronald was moderately limited in this area, and she is obligated to account for those findings in the RFC or explain why she did not.

[7]   The court cannot conclude with great certainty that this error was harmless because the callout operator job the ALJ determined that Ronald could perform requires significant contact with the public.

Circuit "uphold[s] all but the most patently erroneous reasons for discounting a treating physician's assessment," *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010)). As such, "[o]nce contrary evidence is introduced . . . a treating physician's opinion becomes just one piece of evidence for the ALJ to evaluate," and the ALJ must then analyze various factors in deciding the weight to afford it, if any. *Ray v. Saul*, 861 Fed. Appx. 102, 105 (7th Cir. 2021); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Those factors include: the length, nature, and extent of the treatment relationship; frequency of examination; physician's specialty; types of tests performed; and consistency with and support for the opinion in the record. 20 C.F.R. § 404.1527(c). An ALJ's decision to discount a treating physician's opinion after considering these factors stands if she "minimally articulated" her reasons. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Ronald argues that the ALJ erred in her treatment of Drs. Miller's and Struck-Marcell's opinions by: (1) discounting them as inconsistent with other record evidence; (2) failing to adopt any physician's opinion and to explain why the evidence warranted a "middle ground" RFC; and (3) failing to address the regulatory factors. (R. 20, Pl.'s Br. at 18-19; R. 28, Pl.'s Reply at 11-12.) But the government counters that the ALJ more than minimally articulated "good reasons" for affording their opinions less weight by pointing to the "mostly normal" examination findings and "mild" diagnostic imaging and testing. (R. 25, Govt.'s

Resp. at 9-12.)  The government also points to Ronald's testimony that he and his physicians worked together to determine his functional limitations.  (Id.)

At the outset, the court notes that an ALJ need not fully adopt any physician's opinion.  Assessing a claimant's RFC is a fact-finding task reserved for the ALJ.  *See* SSR 96-8p, 1996 WL 374184, at *7.  And the government is correct that "an ALJ does not owe *any* deference to the portion of a treating physician's opinion based solely on the claimant's subjective complaints."  *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021) (quoting *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (emphasis added)).  Ronald does not contest that he provided input to his physicians.  But it is improper to reject a treating physician's opinion on this basis alone when there is also objective evidence to support it.  *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) (holding that ALJ erred in rejecting treating physician opinion as based solely on claimant's subjective complaints where treatment notes reflected objective observations and signs of conditions consistent with claimant's subjective complaints).  And as already discussed, there may be such evidence here. Indeed, while Ronald "cannot prevail by arguing that the ALJ improperly weighed the evidence," it was not permissible for her to "overlook[ ] entire swaths of it." *Reinaas*, 953 F.3d at 466.

Further, Ronald is correct that the ALJ was required to weigh the regulatory factors when explaining her decision to afford Drs. Miller's and Struck-Marcell's opinions little weight.  *See id.* at 465-66 (holding that "[i]n declining to afford [the treating physician's] opinion controlling weight, the ALJ was required to, but did

not, explain her decision with reference to the nature and extent of his treatment and his area of specialty"). In this case, the ALJ specifically discussed the consistency and support factors. (A.R. 126-27.) And while courts have not required ALJs to explicitly discuss each factor in all cases, *see, e.g.*, *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (holding that ALJ need not consider all factors so long as her "decision makes clear that [s]he was aware of and considered many"), this court cannot excuse the ALJ from doing so here. The ALJ's assessment did not include certain evidence that may be favorable to Ronald, and at least one of the other factors she did not address—that is, the length of the treatment relationship and/or frequency of examination—may favor Ronald too. In short, this court is not "confident that the ALJ's reasoning sufficiently accounted for the substance of the prescribed factors." *Ray*, 861 Fed. Appx. at 105-106. Accordingly, the court cannot conclude that the ALJ's decision to discount the treating physicians' opinions is supported by substantial evidence.

## C. Subjective Symptom Assessment

Finally, Ronald argues that the ALJ erred in concluding that his subjective symptom allegations were "not consistent with the medical evidence and other evidence in the record." (See generally R. 20, Pl.'s Br., & R. 28, Pl.'s Reply (citing A.R. 122)). An ALJ's symptom evaluation is generally entitled to great deference because the ALJ can observe the claimant's credibility firsthand. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a court will not disturb that evaluation provided it is logically based on specific findings and evidence and not

27

"patently wrong;" that is, as long as it does not "lack[ ] any explanation or support." *Id.* at 815-16 (citing *Elder*, 529 F.3d at 413-14). In considering a claimant's subjective symptoms, an ALJ assesses the objective medical evidence alongside other factors, including the claimant's daily activities, medication, treatment, or other methods used to alleviate symptoms, as well as factors that precipitate and aggravate pain. SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. § 404.1529; 20 C.F.R. § 416.929(c)(3).

Ronald argues that the ALJ improperly considered his daily living activities, including that he: (1) was his son's primary caregiver; (2) had recently applied for work; (3) drove short distances; and (4) swam weekly with his son. (R. 20, Pl.'s Br. at 19-20; R. 28, Pl.'s Reply at 13.) An ALJ must consider daily living activities "with care," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), because a claimant's "ability to struggle through" them "does not mean that [he] can manage the requirements of a modern workplace," *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). As such, an ALJ generally must explain how such activities are inconsistent with symptom allegations before holding them against a claimant. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (remanding where the ALJ "did not explain why doing [certain] chores was inconsistent with [the claimant's] description of her pain and limited mobility," and any inconsistency was not obvious).

Here, the ALJ failed to explain the inconsistencies between Ronald's daily activities and his claimed symptoms and there are no obvious inconsistencies. For

example, there is nothing inherently inconsistent between a 20-minute driving trip or a 45-minute weekly swim session and the need to switch between standing, sitting, and lying down, and to stretch throughout the day. *See Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015) (the ALJ wrongly emphasized claimant's driving, "fail[ing] to understand" that it was "not inconsistent with being unable to engage in substantial gainful activity"); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (noting that claimant may swim "despite pain for therapeutic reasons, but that does not mean she could concentrate on work despite the pain"). The Seventh Circuit has also expressly acknowledged that a claimant who "must take care of [his] children" may be impelled to "heroic efforts." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). That Ronald looked for work also does not doom his claim. In fact, "a desire to resume work . . . makes a claimant *more* credible, not less." *Cullinan*, 878 F.3d at 604 (emphasis added); *see also Gentle*, 430 F.3d at 867 ("A person can be totally disabled . . . even if, because of an indulgent employer or circumstances of desperation, he is in fact working."). Moreover, Ronald doubted his own ability to hold a job. (See A.R. 30 (stating when asked whether he would be able to perform the jobs for which he applied, "I don't really know, because . . . I need to sit, stand, and then lay down in periods")).

The ALJ also failed to acknowledge the evidence that Ronald takes more time than others to perform many activities. (See, e.g., A.R. 363-64 (January 2016 function report indicating that it takes Ronald "twice as long to get dressed," and "a long time" to shower, use the toilet, and do simple chores), id. at 402, 404-05 (June

2016 third-party function report indicating that Ronald "needs to stop constantly when doing any activity," "struggles with standing longer than a few minutes," and takes "a few hours" to complete tasks that used to take far less time), id. at 419, 421 (June 2016 function report indicating that Ronald has "been taking more breaks than before because of the increased pain"). It is well-settled that "[a]n ALJ cannot disregard a claimant's limitations in performing household activities." *Moss*, 555 F.3d at 562; *see also Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (holding that ALJ erred in "ignor[ing] Craft's qualifications as to how he carried out" his activities). Yet that is what the ALJ has done here.

Nevertheless, "[n]ot all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (emphasis in original); *see also Halsell*, 357 Fed. Appx. at 723 (upholding subjective symptom analysis despite finding that "the ALJ's reasoning [was] imperfect" because she "cited other sound reasons for disbelieving [claimant]"). Here, the ALJ offered other reasons to support her symptom assessment, including the objective medical evidence, Ronald's treatment, and his behavior during the hearing. (A.R. 122-25). But those reasons do not amount to substantial evidence because, in so finding, the ALJ appears to have cherry-picked and ignored entire lines of evidence.

First, the ALJ's summary of the objective evidence did not include certain more recent evidence, at least some of which—including the pelvic MRIs—may support Ronald's claims. Nor did the ALJ discuss the evidence fully and accurately

in all cases, such as the irregularities in Ronald's 2013 left hip MRI and Ronald's physical examinations. While there is evidence that cuts against Ronald's subjective symptom allegations, there is also evidence not mentioned that may support them. The ALJ's analysis of the objective evidence was thus "impermissibly cherry-picked," and her decision to discredit Ronald's allegations on that basis was unsound. *See Annette S.*, 2021 WL 1946342, at *11, *14 (remanding in part because the ALJ only analyzed the objective evidence that supported his credibility determination).

The ALJ also downplayed and mischaracterized Ronald's treatment, noting that as of his 2016 CME he was not seeing a psychiatrist, but omitting that he was referred to psychiatry in 2017, began regular consultations with a rheumatologist around the same time, and was otherwise followed extensively for his physical and mental health complaints. *Cf. Craft*, 539 F.3d at 679 (noting that "[i]n assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not give good reason for the failure or infrequency"). Her subjective symptom analysis therefore lacks the support of substantial evidence. *See Annette S.*, 2021 WL 1946342 at *11 (holding that ALJ's subjective symptom analysis was patently wrong "because at least two of the three reasons for discrediting [the claimant] were unsound"). Accordingly, remand is also necessary on this basis.

**Conclusion**

For the foregoing reasons, Ronald's motion for summary judgment is granted, the government's is denied, and the matter is remanded for further proceedings consistent with this memorandum opinion and order.

ENTER:

_____

**Young B. Kim**
**United States Magistrate Judge**